IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| REACH COMMUNICATIONS SPECIALISTS, INC., : : Plaintiff, : : v. : : JEWELL WILLIAMS et al., : Defendants. : | CIVIL ACTION No. 13-2388 |

**McHUGH, J.** February 13, 2023

## MEMORANDUM

Nominally, this is an action brought by a corporation against the City of Philadelphia and various officials alleging that its lucrative consulting contract with the Philadelphia Sheriff's Office was unlawfully cancelled because of racial animus. But there is more to this case than first meets the eye. That is because the plaintiff here is a closely held corporation with a single shareholder – James Davis – who stands before this court as a felon convicted of bribing the Sheriff to secure the very contract in question. Cloaking himself with a corporate disguise, he still hopes to reap the benefit of his criminal conduct, simultaneously evading an order of forfeiture. Neither Pennsylvania nor federal law permits such an outcome. Because I find that there is an identity of interest between plaintiff Reach Communications Specialists and Mr. Davis, I conclude that Reach is collaterally estopped from seeking to enforce the contract at issue here. This action will be dismissed with prejudice.

## I.     Relevant Background[1]

Plaintiff Reach Communications Specialists, Inc., ("Reach") is a Pennsylvania corporation that provides professional advertising and public relations services. Compl., ECF 71-1 at ¶ 10. Reach is a minority-owned, closely held corporation, and since 2006 the corporation has been entirely owned by James R. Davis, Jr. *Id.*

Defendant Jewell Williams was the Sheriff of Philadelphia at the time this action was filed and is sued in his official capacity only.[2] *Id.* ¶ 11. Defendant City of Philadelphia is a Pennsylvania first class municipality encompassing the City and County of Philadelphia. *Id.* ¶ 12. Defendant Alan Butkovitz was the City Controller of Philadelphia at the time this action was filed and is sued in his individual capacity only.[3] *Id.* ¶ 14. Defendant Barbara Deeley is the former Acting Sheriff of Philadelphia, serving from January 2011 to December 2011, and is sued in her individual capacity only.[4] *Id.* ¶ 16. Collectively, I refer to these four Defendants as the "City Defendants." Defendant Lexington Technology Auditing, Inc. ("Lexington"), is a Delaware corporation with its principal place of business in Conshohocken, Pennsylvania. *Id.* ¶ 18.

---

[1] Because the pending motions for reconsideration seek to renew the earlier motions to dismiss, except for matters of public record, the facts set forth are derived from the pleadings.

[2] Because Sheriff Williams was sued in his official capacity, the proper defendant would therefore be the current Sheriff, Rochelle Bilal. As no party has asked the Court to correct the docket, I will leave the case caption unchanged.

[3] Reach initially sued Controller Butkovitz in both his individual and official capacity, but voluntarily dismissed all claims brought against Butkovitz in his official capacity. *See* ECF 26 at 9 n.2.

[4] Like Controller Butkovitz, Reach voluntarily dismissed all claims brought against Deeley in her official capacity. *See* ECF 26 at 9 n.2.

Sheriff John D. Green was the Sheriff of Philadelphia from his election in 1988 until his retirement on December 31, 2010. In 1989, Reach began providing services to the Philadelphia Sheriff's Office ("PSO") in connection with the PSO's judicial sales of property. *Id.* ¶¶ 10, 47-48. Throughout Sheriff Green's tenure, Reach provided the PSO with other business and services, including settlement services, distribution policies of title insurance, and collection services. *Id.* ¶¶ 53-55, 84-88, 118-129, 107-112. These services were provided pursuant to various oral and written agreements, which are the purported contracts at issue in this matter.

In March 2009, the City Controller's Office commenced an examination of the operations and financial affairs of the PSO. Reach alleges that during this same time period, certain organizations and public officials began to call for the elimination of the Sheriff as an independently elected office. In response, Reach "actively and publicly" supported Sheriff Green's efforts to maintain his position as an elected official. *Id.* ¶ 136.

The Controller's examination and audit focused on the PSO's compliance with regulations related to its revenue, expenditure, and custodial account activity. *Id.* ¶ 139. In August 2010, Controller Butkovitz contracted with Lexington for assistance with the PSO audit. *Id.* ¶ 147. Sometime thereafter, the Controller's Office entered into a supplemental contract with Lexington in connection with the PSO audit on an "emergency basis," without any request for proposals or competing bids. *Id*. ¶ 149. Acting under the "direction and control" of the Controller's Office, Lexington "obtained from Reach access to and copies of data from the computer system used by the [PSO], together with confidential information about the design, structure and function, and a confidential diagram" of Reach's proprietary software, which it had licensed to the PSO. *Id.* ¶ 150.

Controller Butkovitz released the report of his audit of the PSO in October 2010, shortly before Sheriff Green's retirement. *Id.* ¶¶ 145, 151. The report detailed "concerns about the

3

potential for errors or irregularities with respect to nearly $53 million in custodial funds being held by the Sheriff's Office." *Id.* ¶ 153. Following the release of the report, in November 2010, President Judge Pamela Denbe of the Court of Common Pleas of Philadelphia County authorized the First Judicial District of Pennsylvania (covering the Philadelphia Court of Common Pleas and Municipal Court) to retain Lexington as a consultant to audit its computer system. *Id.* ¶ 154. Lexington conveyed a proposal to implement and support a temporary computer system for the judicial district, which would enable the PSO to conduct and distribute proceeds from Sheriff's sales without using Reach's licensed software or services. *Id.* ¶ 155.

On December 31, 2010, Sheriff Green retired, and was succeeded by Barbara Deeley, who became Acting Sheriff on January 3, 2011. On January 7, 2011, former Acting Sheriff Deeley unilaterally terminated all business and contractual relations between the PSO and Reach, without any prior notice. *Id.* ¶ 167. At the time, three title abstract companies provided the PSO with services: (1) Reach, (2) Global Abstract, and (3) City Line Abstract. After taking office, former Sheriff Deeley terminated the PSO's business relationship with Reach and Global Abstract, both of which are owned and operated by Black individuals, but continued to do business with City Line Abstract, which is owned and operated by white individuals. *Id.* ¶ 171.

After the PSO terminated its business relationship, Reach filed this lawsuit in the Court of Common Pleas of Philadelphia County, asserting state law claims for breach of contract, quasi-contract/unjust enrichment, promissory estoppel, and intentional interference with contractual relations. The complaint also included claims under 42 U.S.C. § 1983 for deprivation of its First Amendment rights, deprivation of its rights under 42 U.S.C. § 1981 to make and enforce contracts without discrimination, and civil conspiracy to deprive its constitutional rights, as well as a claim for civil conspiracy to deprive Reach of equal protection of the laws under 42 U.S.C. § 1985.

4

Compl. ¶¶ 182-399. On May 22, 2013, Defendants removed the Complaint to this Court, and filed motions to dismiss. ECF 6 and 7. Judge Legrome Davis denied Defendants' motions on August 13, 2013. ECF 26. Several weeks later, Judge Davis placed this matter in suspense after he was advised by law enforcement officials that continued litigation may "interfere with an ongoing criminal investigation by the United States Attorney's Office." ECF 35.

Two years after Judge Davis placed the matter in suspense, the U.S. Attorney's Office filed charges against former Sheriff Green and James Davis – the owner, president, and chief executive officer of Reach – including four counts of honest services fraud, two counts of filing a false tax return, and three counts of willful failure to file a tax return. *See* Sealed Indictment and Letter from AUSA Unsealing Indictment, *United States v. James Davis et al.*, No. 2:15-cr-138, ECF 1 and 7. After a six-week trial where both Green and Davis testified, a jury convicted Davis of conspiracy to commit honest services wire fraud and to obtain property under color of official right, as well as several counts of tax fraud. *See* Jury Verdict Form, *United States v. James Davis et al.*, No. 2:15-cr-138, ECF 160. As to Green, the jury hung, but the former Sheriff subsequently pleaded guilty to conspiracy to defraud the citizens of the Philadelphia by taking a stream of hidden benefits from Davis, ECF 270, 273, for which he was sentenced to 5 years in prison. ECF 284. The Court sentenced Davis to over ten years in prison and entered final judgment on March 5, 2019. *See* Judgment, *United States v. James Davis et al.*, No. 2:15-cr-138, ECF 243. In connection with Davis' sentencing, the Government sought forfeiture of illegally obtained proceeds. Following customary practice, the Probation Office reviewed the evidence at trial to identify the proceeds of the fraud. After review of the parties' submissions, the sentencing judge made a factual determination that Davis personally profited from his scheme in the amount of $1,718,540 and entered an Order of Forfeiture in that amount. ECF 242.

5

After Davis appealed, the Third Circuit affirmed his conviction and sentence in *United States v. Davis*, 841 F. App'x 375 (3d Cir. 2021), *cert. denied*, 142 S. Ct. 401 (2021).  In reviewing the evidence supporting the conviction, the Circuit stated:

> Here, there is sufficient evidence from which the jury could have concluded that Davis and Green entered into a corrupt bargain. On one side of that bargain, Davis provided Green with a "stream of benefits" . . . For instance, during the 2007 campaign, Davis contributed more than $65,000 in cash and over $148,000 in free advertising services. These contributions came within the context of a larger stream of benefits that Davis provided to Green, including arranging to provide Green a renovated house at a loss, giving Green significant funds for Green's retirement home, and supplying cash. Davis provided these benefits in return for an explicit benefit: to receive multi-million-dollar contracts from the Sheriff's Office. Green had the power to award Sheriff''s Office business and gave Davis over $35 million of it between 2002 and 2010.[5] Continuity of this business was critical to Davis as a significant amount of his companies' work came from the Sheriff's Office, and this flow of steady and lucrative work provided strong motivation for Davis to encourage Green to continue to serve as Sheriff in 2007. Witnesses testified that this was indeed the reason why Davis wanted Green to run and why he had a strong interest in Green's eventual successor.
>
> The pair also sought to conceal the scope of their relationship, which provides a basis to infer that they understood that they had made a corrupt bargain . . . These acts of concealment provided the jury with a basis to conclude that Davis and Green fully understood that Davis would provide Green with benefits in the form of campaign contributions and Davis would receive millions of dollars in Sherriff's Office work, and that neither wanted their arrangement to be known . . . Because there was sufficient evidence upon which the jury could find that an explicit quid pro quo existed, we will affirm its conspiracy and honest services fraud verdicts.

*Id.* at 380.

Judge Davis assumed senior status in September 2017, and after this case was reassigned to me, I continued the stay.  *See* ECF 38 and 39.  Once Defendant Davis exhausted his direct appeal, I removed this matter from suspense.  *See* ECF 55.  All Defendants now move for

---

[5] Almost all this business was given to Reach.  The Circuit noted that in exchange for the benefits flowing to Green, "Reach received over $22 million for Sheriff's Office advertising work" and "received over $12 million for performing real estate services for Sheriff's Office sales." *Id.* at 377-78.

reconsideration of Judge Davis' denial of their motions to dismiss, due to the changed circumstances presented by the criminal conviction.[6]

## II.     Legal Standard

To prevail on a motion for reconsideration, the moving party must demonstrate (1) an intervening change in controlling law; (2) the availability of new evidence that was not available when the court entered its prior ruling; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice. *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  In deciding such a motion, courts consider "allegations contained in the complaint, exhibits attached to the complaint, and matters of public record," including "criminal case dispositions such as convictions." *See Pension Ben. Guar. Corp. v. White Consol. Indus., Inc*., 998 F.2d 1192, 1196-97 (3d Cir. 1993).

---

[6] Reach has also filed a Motion for Stay of Proceedings, ECF 65, pending the outcome of Mr. Davis' Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 in his criminal proceeding.  To determine whether to issue a stay, I consider (1) the promotion of judicial economy; (2) the balance of harm to the parties; and (3) the duration of the requested stay. *Ciolli v. Iravani*, 625 F. Supp. 2d 276, 291 (E.D. Pa. 2009) (Davis, J.).  Reach cannot meet this burden.  This matter sat in civil suspense for nearly a decade, and for the matter to be stayed several weeks later, for an indeterminate amount of time while Davis' motion works its way through the post-conviction process will not promote judicial economy and will significantly prejudice Defendants, who are entitled to a resolution of these claims. *See* Lexington Opp. Br., ECF 72 at 7-8; City Opp. Br., ECF 73 at 1.  I will therefore deny the motion to further stay this proceeding.

**III. Discussion**

The conviction of James Davis for honest services wire fraud constitutes new evidence that was not available at the time of Judge Davis' previous denial of Defendants' motions to dismiss, and therefore constitutes a valid basis to reconsider the prior ruling.

After reviewing the underlying basis for the conviction and whether there was privity between Davis and Reach, I conclude that the conviction invalidates any underlying contractual agreement between Reach and the Sheriff of Philadelphia. On that basis, and consistent with general principles precluding recovery for illegal activity, I will grant reconsideration and dismiss Reach's claims against all Defendants.

**A. Reach Communications is collaterally estopped from establishing the existence of valid contracts between it and the Sheriff of Philadelphia.**

Reach is collaterally estopped from relitigating the validity of its alleged contracts and contractual promises, given that this issue was functionally decided by the federal conviction of James Davis, Reach's former sole owner, president, and chief executive. Collateral estoppel is appropriate where: "(1) the identical issue was decided in a prior adjudication; (2) there was a final judgment on the merits; (3) the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom the bar is asserted had a full and fair opportunity to litigate the issue in question." *Doe v. Hesketh*, 828 F.3d 159, 171 (3d Cir. 2016) (quoting *Del. River Port Auth. v. Fraternal Order of Police*, 290 F.3d 567, 573 n.10 (3d Cir. 2002)). These four requirements are satisfied here.

> *1. The validity of the contracts was decided in the prior criminal proceeding, which resulted in a conviction of James Davis that was affirmed on appeal.*

In convicting James Davis for honest services wire fraud, the jury decided that Reach secured the contracts with the Sheriff's Office as a result of illegal activity – and therefore rendered

any contracts (or prospective contracts) between Reach Communications and the Sheriff void and unenforceable.

In situations involving the collateral estoppel effects of a prior criminal judgment, "the court must examine the record of the criminal proceeding . . . to determine specifically what issues were decided." *Chisolm v. Def. Logistics Agency*, 656 F.2d 42, 48 (3d Cir. 1981). "[W]hen a prior criminal judgment is sought to be used as an estoppel, the court must examine the record of the criminal proceeding, including the pleadings, evidence, jury instructions and other relevant matters in order to determine specifically what issues were decided." *Id.* (citing *Ashe v. Swenson*, 397 U.S. 436, 444 (1970)).

Based on my review of Davis' conviction, the criminal proceeding necessarily decided that these contracts were the result of bribery. The jury convicted Davis of conspiring to commit honest services wire fraud in his dealings with the PSO. *See* Jury Verdict Form, *United States v. James Davis et al.*, No. 2:15-cr-138, ECF 160 at 1. In affirming Davis' conviction, the Third Circuit summarized the evidence supporting that conviction as follows:

> To secure [Reach's business with the Sheriff], Davis bribed John Green, the elected Sheriff of Philadelphia, with a stream of benefits, which took the form of non-campaign and campaign contributions . . .
>
> In exchange for these noncampaign and campaign benefits, Green funneled lucrative Sheriff's Office business to Davis's companies. With Green's approval, from 2002 to 2010, Reach received over $22 million for Sheriff's Office advertising work and RCS received over $12 million for performing real estate services for Sheriff's Office sales. This business constituted about ninety percent of Davis's approximately $1.9 million in net income from 2004 to 2010.

*Davis*, 841 F. App'x 375, 376-78 (3d Cir. 2021). The criminal proceeding therefore conclusively decided that Reach's contracts with the Sheriff were secured by means of illegal activity – specifically, through a corrupt stream of benefits.

Reach contends that the criminal verdict does not automatically void its contracts with the Sheriff, on the ground that that "Defendants have not cited any Pennsylvania law establishing that contracts secured by means of illegal activity are necessarily invalid or void." Pl.'s Opp. Br., ECF 63 at 6-7. I reject this narrow interpretation of Pennsylvania law. "As a general rule, courts will not enforce contractual provisions that are illegal, and illegal in this sense has been defined as 'if either *its formation* or its performance is criminal, tortious, or otherwise opposed to public policy.'" *Shadis v. Beal*, 520 F. Supp. 858, 861-62 (E.D. Pa. 1981), *aff'd*, 685 F.2d 824 (3d Cir. 1982) (emphasis added) (quoting *Contractor Indus. v. Zerr*, 359 A.2d 803, 805 (Pa. Super. Ct. 1976) and Restatement of Contracts § 512 (1932)). Pennsylvania law further allows courts to invalidate a contract for violating public policy where the contract goes against "long governmental practice or statutory enactments" or violates "obvious ethical or moral standards." *Eichelman v. Nationwide Ins. Co.*, 711 A.2d 1006, 1008 (Pa. 1998) (quoting *Hall v. Amica Mut. Ins. Co.*, 648 A.2d 755, 760 (Pa. 1994)). Similarly, the "no felony conviction recovery" rule prevents courts from assisting convicted felons in recovering compensation for conduct underlying the felony conviction. *See DiNardo v. Kohler*, 270 A.3d 1201, 1205 (Pa. Super. Ct. 2022). Pennsylvania courts note that this common-law rule arises from principles of "estoppel" and "public policy," as a person should not be permitted to use the courts "to obtain reward for the crime which the [government] has already concluded he has committed." *Mineo v. Eureka Sec. Fire & Marine Ins. Co.*, 125 A.2d 612, 617 (Pa. Super. Ct. 1956). Applying these principles, I find that contracts secured through bribery are void *ab initio* under Pennsylvania law.

Here, the conviction of Mr. Davis for honest services wire fraud clearly decided that Davis, through his role at Reach, bribed the Sheriff in exchange for contracts to provide an array of services. Under the principles outlined above, this determination invalidates any contractual

10

arrangement between Reach and the Sheriff's Office – provided that there was a full and fair opportunity to litigate this issue, and that there was sufficient privity between defendant Davis and Reach, as discussed below.

> *2. Reach was in privity with James Davis, and Davis had a full and fair opportunity to litigate the validity of Reach's contracts during his criminal trial.*

The second element of collateral estoppel is also satisfied here, as Reach was in privity with the defendant in the criminal proceeding, James Davis, and Davis had a full and fair opportunity to contest the existence of a bribery scheme.

A nonparty is in privity with a party in a previous proceeding where the nonparty was "adequately represented by someone with the same interests who was a party." *See Taylor v. Sturgell*, 553 U.S. 880, 894-95 (2008) (listing privity relationships justifying application of nonmutual preclusion). Applying this principle, courts frequently find privity between a corporate entity and its controlling owner. *See, e.g.*, *Griswold v. Cnty. of Hillsborough*, 598 F.3d 1289, 1293 (11th Cir. 2010) (holding that corporate owner was in privity with his companies because he was their "sole shareholder and President," and his interests were "closely aligned" with those of his companies in prior litigation). While the caselaw on this point often binds corporate shareholders to prior litigation involving the corporation, courts also bind a corporation to prior actions involving its controlling shareholder or owner. *See United States v. Weiss*, 467 F.3d 1300, 1309 (11th Cir. 2006) (holding that corporation was adequately represented in a previous proceeding by its "sole officer, director, and shareholder"); *see also Martino v. McDonald's Sys., Inc*., 598 F.2d 1079, 1083 n.7 (7th Cir. 1979) (finding corporate plaintiff in privity with its sole shareholder). This includes binding a corporation to the findings of a previous criminal proceeding against an owner or controlling shareholder. *See United States v. DiBona*, 614 F. Supp. 40, 44 (E.D. Pa.

11

1984) (estopping corporation from denying liability after its "top officers" pled guilty to violations of the False Claims Act); *Teitelbaum Furs, Inc. v. Dominion Ins. Co.*, 375 P.2d 439, 439-40 (Cal. 1962) (en banc) (estopping corporations based on prior criminal conviction of the corporations' president).

In this case, the pleadings establish that Davis controlled Reach's operations. As set forth in Reach's Complaint:

> At all times relevant to this action, Reach has been a minority-owned and controlled, closely held corporation. Reach was founded in 1986 by James R. Davis, Jr., and the late James D. Cassell, Jr., each a black adult male. From the formation of Reach until Cassell's death on May 2, 2005, Davis and Cassell each owned fifty percent (50%) of the issued and outstanding stock of Reach, and together controlled Reach. On May 23, 2005, the Register of Wills of Montgomery County duly appointed V. Gray-Cassell (also known as Massa V. Gray-Cassell) as Administrator of the Estate of James D. Cassell, Jr. (File No. 46-2005-1719). On or about July 25, 2006, Reach redeemed the stock formerly owned by Cassell from the Administrator of his Estate, leaving Davis the sole shareholder of Reach. At all times following Reach's redemption of the stock formerly owned by Cassell, and continuing to the present, Davis has been the sole shareholder, President and Chief Executive Officer of Reach.

Compl., ECF 71-1 at ¶ 10. Significantly, Davis personally verified the complaint, and did so subject to criminal penalties for false swearing. His verification states: "I, James R, Davis, Jr., verify that I am the sole shareholder, President, and Chief Executive Officer of Reach Communications Specialists, Inc., which, in its own name and t/a RCS Searchers, Inc., is the plaintiff in the foregoing action, and as such am duly authorized to make this verification on its behalf." *Id.* at 106. Reach was also organized as an S corporation, and as explained by an IRS agent at trial, its profits were therefore passed through to Davis as its sole shareholder. Thus, all the money earned by Reach benefited David personally. *See* Trial Tr. 3/8/2018 at 96, *United States v. James Davis et al.*, No. 2:15-cr-138, ECF 194; Reach 2007 Form 1120S, *United States v. James Davis et al.*, No. 2:15-cr-138, ECF 236-3; *see also* 26 U.S.C. § 1366 (governing pass-through tax

12

provisions for S corporations). I therefore find that there was complete privity between Reach and Davis during the prior criminal proceedings.[7]

By any measure, Davis and Reach were one and the same. It follows that Reach had a full and fair opportunity to defend the validity of the contracts in Davis' criminal trial. As noted above, the charges against Davis were resolved by jury verdict after a multi-week trial that primarily involved testimony and evidence about whether Reach received contracts from the PSO in exchange for a stream of benefits flowing to the Sheriff. *See Davis*, 841 F. App'x 375 at 379. In this context, Davis had every incentive to argue – through any means possible – that the contracts between Reach and the PSO were valid and not rooted in public corruption. *See, e.g.*, *Teitelbaum Furs, Inc.*, 375 P.2d at 441-42 (noting that since the corporation's president was charged with felonies punishable with time in prison, "he had every motive to make as vigorous and effective a defense as possible"). Unlike many criminal defendants, Davis testified on his own behalf over the course of two days. *See* Trial Tr. Days 18 and 19, *United States v. James Davis et al.*, No. 2:15-cr-138, ECF 203 and 204. This suffices to establish that Reach had a full and fair opportunity to litigate this issue because there is no question that there was an identity of interest between the corporation and its sole shareholder to whom all profits flowed.

Reach nonetheless argues that it cannot be estopped under *United States ex rel. Doe v. Heart Solution, PC*, 923 F.3d 308 (3d Cir. 2019), implying that the Third Circuit has adopted a rule that a corporation cannot be collaterally estopped based on a criminal proceeding against its owner. I do not read *Heart Solution* so broadly. In *Heart Solution*, Nita Patel and her husband,

---

[7] Nothing in the record suggests that Davis' role at Reach had materially changed by the time his criminal case went to trial.

13

Kirtish Patel, pled guilty to charges of Medicare fraud based on their actions as owners of two separate companies: Heart Solution, PC, and Biosound Medical Services. *Id.* at 311. The opinion describes Ms. Patel as the owner of Heart Solution and Mr. Patel as the owner of Biosound. The government subsequently attempted to hold *both* companies civilly liable for Medicare fraud. *Id.* The Circuit's decision was specifically based on the limited scope of Ms. Patel's guilty plea and colloquy. After reviewing the record, it concluded that "Ms. Patel's plea testimony and conviction certainly speak to her role in Biosound's schemes to defraud Medicare, but they do not establish that Heart Solution had any role in this scheme." *Id.* at 317.

In this case, Davis' criminal case involved a weeks-long trial and conviction that conclusively determined that he engaged in honest services wire fraud on behalf of Reach to secure contracts for his company – in stark contrast to the minimal evidence elicited through the short plea colloquy in *Heart Solution*. Davis' trial record was also supplemented by additional findings at the time of sentencing, where the Court identified the unlawful profits that flowed through to Davis as part of its Order of Forfeiture. The record here does not suffer from the infirmities that concerned the Circuit in *Heart Solutions*.

### B. Reach's claims must be dismissed.

#### 1. *Reach can no longer establish any of its state law claims (Counts 1-22).*

Judge Davis, in previously denying Defendants' Motions to Dismiss, noted that the central issue for several of Reach's state law claims is whether a contract exists. *See* ECF 26 at 6. Indeed, after reviewing the state law claims that Reach asserts, each requires the Plaintiff to plead the existence of a valid contract or agreement in order to state a claim. A plaintiff must plead "the existence of a contract" among other elements to establish a breach of contract claim. *CoreStates Bank, Nat'l Assn. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super Ct. 1999). Establishing tortious

14

interference with a contract similarly requires the existence of a valid contractual relationship. *Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 98 (Pa. Super. Ct. 2009). Absent a valid underlying contract between Reach and the PSO, these claims necessarily fail.

Reach's claims of promissory estoppel and quasi-contract/unjust enrichment also fail, for slightly different reasons. As equitable doctrines, both claims require courts to determine the equitable financial result in a dispute. Promissory estoppel requires a plaintiff to show that "injustice can be avoided only by enforcing the promise." *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 718 (Pa. Super. Ct. 2005). An unjust enrichment claim likewise requires a plaintiff to show that one party "has been unjustly enriched at the expense of another." *Mitchell v. Moore*, 729 A.2d 1200, 1202 n.2 (Pa. Super. Ct. 1999). It would hardly be just or equitable to allow Davis to reap the benefits of his criminal conduct. These claims therefore also fail.

Indeed, allowing *any* of these claims to proceed would also violate Pennsylvania's "no felony recovery rule" by rewarding the criminal activity committed to enrich Reach's business. *See DiNardo*, 270 A.3d at 1205; *Mineo*, 125 A.2d at 617. I will therefore vacate Judge Davis' previous ruling in this case and dismiss Reach's state law claims with prejudice.[8]

   2. *Reach's federal claims similarly fail as a result of Davis' conviction.*

Reach's federal claims also fail in the absence of a valid contractual relationship between Reach and the PSO. A valid contractual relationship is necessary to support Reach's claim for deprivation of property without due process of law. Only certain state types of contracts create

---

[8] The City Defendants also argue that Reach cannot plausibly allege that the contracts complied with the Philadelphia Home Charter's provisions governing contracts given Davis' conviction. *See* ECF 61-2 at 9. Because I have already conclusively determined that Reach's claims fail on other grounds, I do not address whether enforcement of the contract would violate the Charter.

protected property interests under the Fourteenth Amendment: (1) a contract "characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure, or sometimes both, as frequently occurs in the case of social security benefits," or (2) a contract that "includes a provision that the state entity can terminate the contract only for cause." *Baraka v. McGreevey*, 481 F.3d 187, 207 (3d Cir. 2007) (quoting *Linan-Faye Const. Co., Inc. v. Hous. Auth. of Camden*, 49 F.3d 915, 932 (3d Cir. 1995)).  Even assuming that the contract here would create a cognizable property interest, if a contract is invalid as a matter of law, no such property interest exists.  *See Stidham v. Tex. Comm'n on Private Sec.,* 418 F.3d 486, 492 n.9 (5th Cir. 2005) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)) (emphasizing that "there must be an enforceable contract between the parties" for a constitutionally protected property interest to exist).

Reach's claim that Defendants violated its rights under Section 1981 similarly fails. "Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship."  *Faush v. Tuesday Morning, Inc*., 808 F.3d 208, 220 (3d Cir. 2015) (quoting *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006)).  Once again, without a legally enforceable contract or prospective contract, Reach cannot allege a claim under Section 1981.

> 3. *On the record here, the principles of* Heck v. Humphrey *also bar Reach's claims.*

To the extent that Reach could possibly still establish the elements of any of its federal claims, *Heck v. Humphrey*, 512 U.S. 477 (1994), weighs against allowing this action to proceed. In *Heck*, a plaintiff convicted of voluntary manslaughter in state court brought a Section 1983

action against prosecutors and a police investigator, asserting a variety of constitutional claims arising out of his prosecution. The common theme of the claims asserted was that a constitutionally flawed process had produced his conviction. *Id.* at 479. Given that the claims necessarily attacked the validity of the conviction, the Supreme Court held that such claims were not cognizable under Section 1983 unless the conviction was first set aside. *Id.* at 486-87.

*Heck* is most often applied in the context of challenges to conduct by law enforcement and other actors that led to a conviction. *See, e.g.*, *Saunders v. BB&T Bank*, No. 20-CV-4530, 2020 WL 6146654, at *6 (E.D. Pa. Oct. 20, 2020) (McHugh, J.), *aff'd*, 852 F. App'x 651 (3d Cir. 2021). In exceptional cases, however, *Heck* may bar other civil suits that necessarily imply the invalidity of prior conviction. *See Platts v. Buchanan*, No. CIV.A. 12-1788, 2013 WL 4810486, at *7 (W.D. Pa. Sept. 9, 2013) (Kelly, J.) ("While *Heck* specifically addressed civil rights actions under Section 1983 in which damages were sought, the rationale of *Heck* has not been limited to such civil rights cases only."); *Terry v. U.S. Small Bus. Admin.*, 699 F. Supp. 2d 49, 55 (D.D.C. 2010) ("Courts have extended *Heck*'s rationale beyond the context of § 1983 to a variety of situations where a plaintiff has been convicted of a federal crime and later files a civil action which, if successful, would necessarily imply the invalidity of the plaintiff's conviction.").

No court has clearly addressed whether *Heck* can bar a civil suit for damages by a person or entity nominally different than the person or entity previously convicted. Nonetheless, I have previously noted that in practical terms, "the rule in *Heck* functions similarly to the doctrine of collateral estoppel." *Fuller v. Narkin*, No. CV 16-995, 2018 WL 6171645, at *3 (E.D. Pa. Nov. 26, 2018), *appeal dismissed*, 792 F. App'x 238 (3rd Cir.2019). Applying this concept, I conclude that a closely held Subchapter S corporation controlled by a single shareholder is bound by a criminal conviction against that shareholder when the conviction arose out of the shareholder's

17

acts on behalf of the corporation.⁹ All Reach's federal claims against Defendants, including First Amendment retaliation and civil conspiracy under Section 1983 and Section 1985, are therefore barred under *Heck*. *Cf. Saunders*, 2020 WL 6146654, at *6 (noting that civil rights claims under §§ 1985 and 1986 may also be barred by *Heck*).

## IV. Conclusion

For the reasons set forth above, Defendants' Motions for Reconsideration will be granted, and Plaintiff's Complaint is dismissed with prejudice. An appropriate order follows.

                                                   /s/ Gerald Austin McHugh
                                                   United States District Judge

---

⁹ I share the concern of my former colleague Judge Restrepo that courts should exercise caution in expanding the applicability of *Heck*, so as not to risk unwarranted limitations on meritorious suits to vindicate a plaintiff's civil rights. *See, e.g., Muhammad ex rel. J.S. v. Abington Twp. Police Dep't*, 37 F. Supp. 3d 746, 755 (E.D. Pa. 2014) (Restrepo, J.) (emphasizing limitations on *Heck's* applicability). Such risks do not concern me on the facts of this case, considering Davis' clear privity with Reach and the obvious attempt by Davis to exploit corporate formalities to profit from his crimes. *See Fuller*, 2018 WL 6171645 at *3 (noting that a court applying *Heck* must carefully "examine the nature of the plaintiff's challenge, giving careful regard to all his allegations, the underlying verdict, as well as the factual findings necessary to reaching it.").